MICHELE STEVENSON o/b/o D.S.,

       Plaintiff,

       v.

CAROLYN COLVIN, Acting Commissioner
of Social Security,

       Defendant.

No. 14 C 2640

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Michele Stevenson brings this action pursuant to 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security denying Stevenson's claim for Supplemental Security Income benefits ("SSI") on behalf of her son, D.S., who is a minor. *See* R. 9. The parties have filed cross-motions for summary judgment. R. 12; R. 20. For the following reasons, Stevenson's motion is denied and the Defendant's motion is granted.

## Background

### I.  Determining Childhood Disability

In order for a child to qualify as disabled and thus be eligible for SSI the child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations require an

Administrative Law Judge ("ALJ") to address three factors when determining whether a child is disabled. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in "substantial gainful activity." *Id.* If the child is not engaged in substantial gainful activity the ALJ must consider the child's mental and physical impairments to see if he has an impairment or combination of impairments that is severe. *Id.* If the ALJ finds that the impairment is severe, she must review the claim further to determine whether the impairment "meets, medically equals, or functionally equals the listings" at 20 C.F.R. pt. 404, subpt. P, App. 1., which is a list of disabilities that qualify for SSI. *Id.*

In order to functionally equal a "listing," the impairment must be of a "listing-level" severity, meaning it "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A marked limitation is found when the child's impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities" or when an impairment is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is found when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). In this phase the ALJ must "consider the combined effect" of all medically determinable

impairments, even those that are not severe. 20 C.F.R. §§ 416.923; 416.924a(b)(4); 416.926a(a).

## II.    D.S.'s History

D.S. was born on December 6, 1997. R. 11-1 at 49 (AR 45), 78 (AR 75). He has been diagnosed with a number of developmental, psychological, and learning impairments including attention deficit hyperactivity disorder ("ADHD"), anxiety disorder, major depressive disorder, pervasive developmental disorder, Asperger's Syndrome, autism spectrum disorder, and auditory processing disorder. R. 11-1 at 27 (AR 23). D.S. has received treatment for these disorders such as medication and psychotherapy beginning in at least 2006. R. 11-1 at 27 (AR 23); *see* R. 13 at 3.

D.S. has lived in several different places due to his father being in the military. R. 11-1 at 27 (AR 23). D.S.'s family moved from Germany to Grand Forks air base in North Dakota in the middle of 2007 when D.S. was in third grade. *Id.* at 283 (AR 279). His parents separated in 2010 and his father was re-stationed to Maryland in November 2010 with the rest of the family moving to Chicago on December 1, 2010. *Id.* at 313 (AR 309), 315 (AR 311). In addition to his mother, D.S. lives with his younger sister and his grandmother. *Id.* at 284 (AR 280).

### A.    Medical History

D.S. has a long history of medical treatment for mental, developmental, and physical issues. He was first diagnosed with ADHD at the age of five and at the age of ten he underwent a psychiatric evaluation for reassessment of ADHD or autism with psychiatrist, Dr. Ellen Feldman. M.D. *Id.* at 283 (AR 279), 469 (AR 465). The

evaluation was prompted by D.S.'s difficulty at school and because he was inattentive and distractible. *Id.* at 283 (AR 279). At the time he was also having significant social problems, such as trouble with temper control and easily becoming frustrated. *Id.* Dr. Feldman tried several medications with D.S. but had difficulty identifying a medication that did not cause effects. *Id.* at 286-91 (AR 282-87).

At an October 2008 visit, however, Dr. Feldman noted that D.S. was no longer having trouble in school. *Id.* at 287 (AR 283). In 2009, D.S. began taking Prozac and showed improvement. *Id.* at 289 (AR 285). Between April and November 2010, D.S. was also treated by Certified Family Nurse Practitioner Jean Gullicks, Ph.D., who noted that D.S. "is doing better when he is on [medication]." *Id.* at 313 (AR 309); *see also id.* at 313-30 (AR 309-26).

While living in North Dakota from 2008 to 2010, D.S. was also treated by psychologist, Dr. Allison Tait, Ph.D. *Id.* at 460-61 (AR 456-57). Dr. Tait treated D.S. for ADHD, anxiety, and depression but she did not diagnose him with Asperger's Syndrome. *Id.* In a letter dated January 10, 2012, she noted that D.S. had significant learning difficulties, had been on an Individualized Education Plan for special education services ("IEP"), had poor math and reading skills, required adult supervision to complete most tasks in school, and had failed many classes in school despite having significant help. *Id.* She also discussed the fact that he was vulnerable to peer influences and had "extreme difficulty with maintaining concentration and focus." *Id.* She emphasized that he required a lot of adult supervision to complete school tasks and likely required it at home as well, and that

D.S. had "failed many classes in school." *Id.* Dr. Tait's letter did not offer an opinion regarding the extent of D.S.'s limitations with respect to the Social Security regulation's definition of disability, and she noted that she had "not seen [D.S.] for a year." *Id.*

In April 2011, after moving to Chicago, D.S. began seeing Dr. Therese (Terry) Finn, a registered clinical psychologist, every three weeks for behavioral counseling. R. 11-1 at 191 (AR 187), 395-97 (AR 391-93). Dr. Finn submitted a letter to the SSI Committee on December 28, 2011 stating that D.S. had been diagnosed with ADHD, anxiety disorder, and Asperger Syndrome. *Id.* at 394 (AR 391). She also noted that he had been in special education since preschool and had an IEP at school to accommodate his disabilities. *Id.* Dr. Finn wrote that "[D.S.] needs significant support both socially and emotionally at school, as well as the community." *Id.*

In June 2011, D.S. also began seeing Dr. Harcharan Sandhu, a psychiatrist. R. 11-1 at 147 (AR 143), 383 (AR 379). Dr. Sandhu saw D.S. once every two months and diagnosed him with pervasive developmental disorder, a learning disorder, and major depressive disorder. *Id.* at 383 (AR 379), 387 (AR 383). At the time of D.S.'s application for SSI he was taking Prozac for depression and Vyvanse for ADHD and anxiety as prescribed by Dr. Sandhu. *Id.* at 148 (AR 144). Dr. Sandhu submitted a report on October 4, 2011 to the Illinois Department of Human Resources in connection with Stevenson's application for SSI indicating he had observed a number of behaviors in D.S. supporting a diagnosis of ADHD, and potentially a diagnosis of oppositional defiant disorder and childhood depression. *Id.* at 383-89

(AR 379-85). On January 5, 2012, Dr. Sandhu submitted another letter in connection with Stevenson's application stating that D.S. had been diagnosed with pervasive developmental disorder and then stating "[h]e is totally disabled. He is a special needs child[.] He has severe impairment in his social and academic functioning." *Id.* at 449 (AR 445).

## B. Educational History

In addition to his medical treatment, D.S. has received special education services in school for many years. These services have included special education instruction in a classroom setting with more than one teacher, special testing accommodations, and behavioral counseling. *Id.* at 219-23 (AR 215-19). In January and February of 2011, when D.S. was in seventh grade, he underwent a speech and language re-evaluation performed by his school speech and language pathologist, Elizabeth Cichocki. *Id.* at 168-71 (AR 164-67). Cichocki noted that D.S. was friendly and cooperative during the evaluation periods and asked several reasonable questions as to why he was receiving speech therapy. *Id.* at 168 (AR 164). With one exception his scores fell within the average range indicating D.S. had average expressive language skills and below average receptive language skills. *Id.* at 169 (AR 165), 171 (AR 167). Speech therapy was recommended on this basis. *Id.*

In 2010, D.S. was placed in regular education classes but received 60 minutes of speech therapy and 30 minutes of counseling with a social worker a week. *Id.* at 154 (AR 150). In April 2011, when he was thirteen years old, D.S. underwent a psychological assessment for the school district. *Id.* at 402 (AR 398). D.S. received

average scores for his IQ, verbal comprehension, perceptual reasoning, and processing speed. *Id.* at 403-04 (AR 399-400). These scores indicated that D.S.'s levels of scholastic aptitude had matured to overall levels "typical" for his age group. *Id.* at 403 (AR 399), 406 (AR 402). D.S. also scored in the average range with regard to working memory and social and emotional functioning. R. 11-1 at 404 (AR 400), 409 (AR 405). Based on the results of the assessment it was recommended that D.S. continue his IEP and continue his outpatient consultation and treatment. *Id.* at 412 (AR 408).

In a report submitted on September 29, 2011 to the Social Security Administration, staff at D.S.'s school reported that D.S. had a speech and language impairment, emotion disturbance/behavior disorder, and Asperger Syndrome. *Id.* at 154 (AR 150). One teacher noted that D.S. had some problems in the fields of acquiring and using information and attending and completing tasks. *Id.* at 156-58 (AR 152-54). This report indicated that while D.S. could work independently, he needed assistance at times to stay focused and could be distractible in class. *Id.* No depressive symptoms or behaviors were noted. *Id.* at 161 (AR 157). His speech therapist noted no severe speech issues, *id.* at 164-67 (AR 160-63), and stated that he was making "fair" progress at a "typical" rate. *Id.* at 167 (AR 163).

An additional report from D.S.'s school on January 13, 2012, discussed his IEP and noted that he had "progressed with his goals of using strategies to help remember assignments, tasks, and instructions." R. 11-1 at 213 (AR 209). The report noted, however, that D.S. had a "difficult time following and understanding

multistep directions and correctly recalling information." *Id.* at 216 (AR 212). He received special accommodations by having additional time to complete assignments and tests, taking his tests in a classroom with fewer students, and being seated at the front of the class. *Id.* at 219 (AR 215), 228-30 (AR 223-26). In 2012, while in eighth grade, D.S. was receiving 30 minutes of speech therapy and 45 minutes of social work services a week. *Id.* at 221 (AR 217). He was in general education environments for 89.33% of the total school day, and in special education instruction for 12% of his classroom time. *Id.*

Early in the 2011-12 school year, D.S. "was not passing the majority of his classes." R. 11-1 at 276 (AR 272). But later that school year, by April 2012, D.S. was "doing well in school." *Id.* That month, D.S. had an auditory processing exam. The audiologist who examined D.S. recommended the following: (1) D.S. should receive preferential seating in the classroom; (2) D.S. should be spoken to "clearly, slowly, and distinctly in short simple sentences"; (3) instructions given to D.S. should be "relatively short"; (4) "[u]se of an ear level or soundfield FM system" to allow D.S. "to more easily concentrate on the teacher's voice"; and (5) "[t]raining focus[ed] on auditory processing and reading." *Id.* at 470 (AR 466). By December 2012, D.S. was in mostly mainstream classes in high school, received no grades below a C, and was noted to be "personable" and "polite" at school. *Id.* at 27 (AR 23), 50 (AR 46), 254 (AR 250).

## III.    Application for Social Security Income Benefits

On August 12, 2011, Stevenson applied for SSI for D.S. R. 11-1 at 78 (AR 74), 144 (AR 140). The application for SSI alleged that D.S. had been disabled due to Asperger's Syndrome, anxiety disorder, depression and asthma since October 1, 2004. *Id.* at 83 (AR 79). The claim was denied initially on January 27, 2012, and again upon administrative reconsideration on June 26, 2012. *Id.* at 80 (AR 76), 84 (AR 80).

Prior to the June 26, 2012 decision upon administrative reconsideration, D.S.'s records were evaluated by consultants for the Social Security Administration. An evaluation signed by Dr. Victoria Dow on June 22, 2012; speech and language pathologist Carol Varney on May 25, 2012; and Dr. Elizabeth Kuester on June 12, 2012, found that D.S.'s "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." R. 11-1 at 474-75 (AR 470-71). In assessing the "domains" relevant to a disability determination under the Social Security regulations, the evaluators found that D.S. had "less than marked" limitation in the domains of "acquiring and using information," "attending and completing tasks," and "interacting and relating with others." *Id.* at 476 (AR 472). In finding that D.S.'s limitations are "less than marked" in these domains, the evaluators noted that D.S. "can work independently but does need assistance to stay on task at times," and that he has "borderline to low average intellectual functioning and significant learning difficulties as a result." *Id.* The evaluators also noted that "medication does improve his condition," his "speech is without error,"

and his "[v]ocal quality and fluency were intact." *Id.* The evaluators also found that D.S. had "no limitation" in the domains of "moving about and manipulating objects," "caring for yourself," and "health and physical well-being." *Id.* at 477 (AR 473).

## A.    The Administrative Hearing

Stevenson filed a timely request for a hearing on July 2, 2012. R. 13 at 2. On December 17, 2012, an oral hearing was held before ALJ Karen Sayon (the "ALJ"). R. 11-1 at 41 (AR 37). Stevenson was not represented by counsel at the hearing. *Id.* at 43-45 (AR 39-41). The ALJ informed Stevenson of her right to an attorney, what the attorney would do for her, the option of free legal services, and the option to request a continuance so she might obtain counsel. *Id.* at 44-45 (AR 40-41). Stevenson, however chose to proceed with the hearing pro se. *Id.* at 45 (AR 41). Stevenson, D.S., and Dr. Finn testified at the hearing. R. 11-1 at 22 (AR 18), 49-77 (AR 45-73).

### 1.    D.S.'s Testimony

D.S. testified that he was 15 years old and in ninth grade. *Id.* at 49 (AR 45). He stated that he had "been struggling" with his school work but that his grades were "good" and "come out really okay." *Id.* at 49 (AR 45). When the ALJ inquired as to the cause of his struggles, D.S. testified that it was because his classes were "real hard," and again stated that his grades were pretty good, mostly Bs and Cs. *Id.* at 50 (AR 46). While he testified that he was not receiving the special help he was supposed to, he stated that he sat in the front of his classes and took tests with a smaller group of students. *Id.* at 50 (AR 46), 55 (AR 51).

D.S. also testified that he received homework, he "sometimes" had problems doing his algebra work, and when he had trouble he would get help from his mom but otherwise did his homework himself. *Id.* at 54 (AR 50). When asked whether he had any problems focusing or concentrating on his homework D.S. stated "[s]ometimes, because it sometimes can be too hard." *Id.* He informed the ALJ that he has never been held back and that he had one friend in the neighborhood who he played video games with. *Id.* at 54-55 (AR 50-51).

D.S. testified that he did not talk to many kids at his school "because all they are is trouble," but he liked to play basketball and did not have a problem getting along with the other kids on the court. *Id.* at 51 (AR 47), 52 (AR 48). While he did chores at home his mother often had to remind him to complete the chores, which at times would make him mad. *Id.* D.S. also testified that he was able to get ready for school and walk to the bus by himself. *Id.* at 55 (AR 51).

### 2. Stevenson's Testimony

Stevenson testified that D.S. was taking Vyvanse and was supposed to take Prozac but it made him feel ill. R. 11-1 at 59 (AR 55). Stevenson added that the Prozac, which D.S. had been on and off of for about a year and half, makes him more aggressive and irritable. *Id.* Stevenson testified that D.S. was rude to his caseworker and his algebra teacher. *Id.* at 57-58 (AR 53-54).

Stevenson confirmed that D.S. did have a friend a year younger than him and expressed concern that he really wanted to fit in with kids at school, which made him very vulnerable to peer influences. *Id.* at 60 (AR 56). She testified that ever

since an incident when he was cited for truancy and trespassing when hanging out with some of his peers, D.S. had done well and chosen to stay away from peers who might get him into trouble. *Id.* at 63 (AR 59). When the ALJ asked whether D.S. was isolated from other students at school Stevenson stated that he would speak with them at lunch but otherwise distanced himself because he did not want to get in trouble again. *Id.*

Stevenson also testified that D.S. is easily distracted, and has a hard time following multi-step directions. *Id.* at 62 (AR 58). Stevenson has left D.S. home alone and with his younger sister. *Id.* at 65 (AR 61). Stevenson concluded by stating that D.S. was "really a great kid." *Id.* at 67 (AR 63).

### 3.   Dr. Finn's Testimony

Since Stevenson was not represented by counsel at the hearing, the ALJ directed Dr. Finn's testimony. The ALJ began by asking Dr. Finn to describe generally D.S.'s "problems." R. 11-1 at 69-70 (AR 65-66). In response, Dr. Finn testified, "Basically his socialization, it's immature due to his diagnosis of autism spectrum disorder. So basically we reflect on safety issues as far as environment, school. . . . He's really done well for the huge changes from such a protective military environment to the city. He's done well." R. 11-1 at 70 (AR 66). The ALJ asked whether Dr. Finn had "any specific examples . . . where [D.S.] hasn't made a good decision about being influenced by his peers." R. 11-1 at 71 (AR 67). Dr. Finn responded, "Yeah, I think there was a thing where he was – where he got a ticket from before. . . . He didn't seem to get the gravity of it all." *Id.* Dr. Finn also

testified, however, that D.S. is "now very alert" to the fact that many of his peers are "gangbangers," and "so [D.S.] stays away" from them. R. 11-1 at 73 (AR 69).

The ALJ also questioned Dr. Finn about D.S.'s ability to concentrate and focus. *See* R. 11-1 at 71 (AR 67). Dr. Finn testified that D.S. "definitely" has difficulty concentrating and focusing, but did not elaborate further. R. 11-1 at 71-72 (AR 67-68). Later during Dr. Finn's testimony, the ALJ returned to the subject of D.S.'s ability to concentrate, referencing Stevenson's testimony that D.S. "has difficulty following multistep kind of commands or questions." R. 11-1 at 73 (AR 69). Dr. Finn stated that she had noticed this as well, and explained, "As a matter of fact, he was formerly diagnosed with a central auditory processing disorder because of that. With therapy we, we talk a lot, we – it's, you know, pretty casual. We chew gum, you know, we do all those kinds of things. But yeah, I did notice at some point he would forget or not see the process from session to session." R. 11-1 at 73-74 (AR 69-70). Dr. Finn also addressed this issue when the ALJ asked her about the accommodations she recommended to D.S.'s school. *See* R. 11-1 at 73 (AR 69). Dr. Finn testified that she recommended the school provide "extended time for testing, copy of lecture notes, doing queuing work; like, in other [words] queuing, if he seems to be drifting in his attention." *Id.* She explained further, "He's not hyper, but he's more of a drifter where, you know, the teacher can kind of queue that he's got to bring him back," and also ensure that D.S. sits in the front of the class so "the distractions are behind him." *Id.*

The ALJ also asked Dr. Finn to address Stevenson's testimony regarding D.S.'s feelings of anger. *See* R. 11-1 at 72 (AR 68). Dr. Finn testified that D.S. was "real sweet one-to-one," but "now as he's getting older, and the male hormone, testosterone, I think he doesn't know what to do with that aggression, the feelings." *Id.* She explained that D.S. "gets especially angry with his uncle, [Stevenson's] brother, because he kind of teases, and I don't think he understands what's going on, but – so [Stevenson has] been good to bring him out of that situation . . . ." R. 11-1 at 72 (AR 68). The ALJ also asked Dr. Finn whether D.S. gets along with his sister, and Dr. Finn testified that he does. *See* R. 11-1 at 72 (AR 68).

## B.    The ALJ's Decision

On January 10, 2013, the ALJ issued her written opinion denying SSI for D.S. and finding that D.S. is not disabled within the meaning of the Social Security Regulations. R. 11-1 at 22 (AR 18). The ALJ found that D.S. has the following severe impairments: ADHD; anxiety disorder; Asperger Syndrome; speech and language delay; major depressive disorder; asthma; and auditory processing disorder. *Id.* at 25 (AR 21). The ALJ found, however, that none of these impairments, alone or in combination, met, medically equaled, or functionally equaled a "listing" disability that qualifies an individual for SSI. *Id.* The ALJ further found that the allegations of disabling limitations were not supported by the record evidence. *Id.* at 27. Accordingly, the ALJ stated that D.S. was not disabled under the Social Security Act. *Id.* at 35-36 (AR 31-32).

The ALJ's decision focused on the evidence of D.S.'s performance in school. The ALJ noted that:

> [D.S.] has improved and is functioning relatively well, despite [his] impairments. He is in mostly mainstream classes in high school, and received nothing less than a C. He is noted to be polite and personable at school. He can focus to do his homework and play video games. He has never been held back in school, and testified he is doing well in school. He also received average IQ scores. A review of his file shows his progress.

R. 11-1 at 27 (AR 23). The ALJ found that:

> [i]n diagnostic impressions, it was noted that the [D.S.'s] current levels of scholastic aptitudes had matured to overall levels typical for his age, and his symptoms were not as pronounced as in the past.
>
>          *      *      *
>
> Although [D.S.] is easily distracted, he can focus on homework and video games. . . . [H]is mother and Dr. Finn testified [that] he is susceptible to peer pressure. However, his mother testified he is learning to make better judgments. The claimant also testified that he stays away from children in school because he feels them to be a bad influence. This is certainly improvement in judgment.

*Id.* at 28-29 (AR 24-25).

After making these findings, the ALJ stated, "I acknowledge that I have not accommodated all of the alleged symptoms and limitations." *Id.* at 29 (AR 25). The ALJ did not specifically identify what "symptoms and limitations" she had not "accommodated." By stating that she had not "accommodated" certain "symptoms and limitations," the ALJ apparently meant that she had not taken the allegations of these "symptoms and limitations" into account in rendering her final decision, because she justified this decision stating:

> This is because, after considering the factors in [Social Security Ruling] 96-7p, I find the allegations are not fully credible. The evidence fails to establish disabling limitations. The claimant is functioning pretty well, receives good grades in mainstream classes, testified he can concentrate on his homework, received average IQ scores and was noted to be polite by his school. The claimant was polite and answered questions in a normal manner at the hearing. Overall, he is doing well, despite his impairments.

*Id.*[1] For these reasons, the ALJ found that D.S.'s "functioning is not at listing level or equivalency." *Id.*

The ALJ's written decision also reviewed the opinions of Dr. Tait, Dr. Sandhu, and Dr. Finn that are included in the record. R. 11-1 at 28-29 (AR 24-25), The ALJ found that Dr. Sandhu's opinion that D.S. is "'totally disabled' . . . . is not supported by the evidence, which shows improvement in functioning and good performance at school." *Id.* at 30 (AR 26). The ALJ also found that Dr. Finn's opinion that D.S. is "disabled or ha[s] significant limitations," is not supported by the "medical and school records." *Id.*

The ALJ noted that her assessment of the evidence was supported by the Social Security Administration's consulting doctors who found that D.S. exhibited either "no limitation" or "less than marked limitation" in all the domains. The ALJ

---

[1] Social Security Rulings, or "SSRs," "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). SSR 96-7p is titled, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." *See* 1996 WL 374186 (July 2, 1996). This Ruling "explain[s] [the] process by which ALJs must evaluate [the] credibility of applicants." *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014).

stated that she "afford[ed] this opinion great weight, as it is supported by the entirety of the evidence, including [D.S.'s] improvement in functioning and school performance." R. 11-1 at 30 (AR 26).

Stevenson filed a timely appeal of the decision on March 11, 2013, and the Appeals Council denied review on February 11, 2014, leaving the ALJ's decision as the Commissioner's final decision reviewable under 42 U.S.C. § 405(g). R. 3 at ¶¶ 6-7; R. 11-1 at 5 (AR 1); *see also Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) ("If the Appeals Council denies a request for review, as it did here, the ALJ's decision becomes the final decision of the Commissioner of Social Security.").

## Legal Standard

A court reviews the Commissioner's factual findings to determine whether they are "supported by substantial evidence." 42 U.S.C. § 405(g). Thus, a court "will uphold the Commissioner's decision if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Although this standard of review is generous, it is not entirely uncritical, and where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. The court may "not displace the ALJ's judgment by reconsidering facts or evidence and will not making independent credibility determinations."

*Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). "Therefore, even if reasonable minds could differ concerning whether [claimant] is disabled, we affirm if the ALJ's decision has adequate support." *Id.*

While the standard of review is deferential, the ALJ must at least "minimally articulate" the reasons for her decision, *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), with "enough detail and clarity to permit meaningful appellate review." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ is not required to "address every piece of evidence," but must provide some "legitimate reason" for her decision and cannot address "only the . . . evidence favoring the denial of benefits." *See Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ must "build an accurate and logical bridge from the evidence to [her] conclusion." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015).

## Analysis

Stevenson argues that the ALJ erred in three ways: (1) "[t]he ALJ committed a reversible error by improperly weighing the medical opinion evidence of record"; (2) "[t]he ALJ failed to adequately develop[] the record in a pro se case"; and (3) "[t]he ALJ's credibility determination is flawed." R. 13 at 6.

## I. Weighing of the Medical Opinion Evidence

Generally, if a treating physician's opinion is well supported and consistent with the other substantial evidence in the record it is entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir.

2010). An ALJ who does not give controlling weight to the opinion of treating physicians must provide "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (or a "sound explanation"). "A claimant, however, is not entitled to disability benefits simply because a [treating] physician finds that the claimant is 'disabled' . . . ., [since] the Commissioner is charged with determining the ultimate issue of disability." *Clifford*, 227 F.3d at 870. The ALJ "is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—*which need not itself be medical in nature*." *Simila*, 572 F.3d at 515 (emphasis in original). "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

### A.    Dr. Tait

Stevenson argues that the ALJ "did not evaluate [Dr. Tait's] opinion evidence," R. 13 at 8, specifically her January 10, 2012 letter stating that D.S. had "extreme difficulty with maintaining concentration and focus." R. 11-1 at 460 (AR 456). Stevenson contends that "[t]his omission is significant because this evidence directly contradicts the ALJ's findings that [D.S.] has a 'less than marked limitation in attending and completing tasks.'" R. 13 at 9 (citing R. 11-1 at 32 (AR 28)). Stevenson argues that by failing to evaluate Dr. Tait's opinion, the ALJ failed to comply with 20 C.F.R. § 404.1527(c), which requires an ALJ to "evaluate every medical opinion . . . receive[d]" in the record. R. 13 at 7.

The Court disagrees that that the ALJ "did not evaluate" Dr. Tait's opinion that D.S. has "extreme difficulty with maintaining concentration and focus." After reviewing the documentary evidence and testimony, including Dr. Tait's opinion, *see* R. 11-1 at 28 (AR 24), the ALJ acknowledged that D.S. "is easily distracted." *Id.* at 29 (AR 25). This is another way of expressing Dr. Tait's opinion. Of course, in addressing this opinion, the ALJ did not attach Dr. Tait's name to it, but the ALJ addressed the substance of Dr. Tait's opinion nonetheless.

The ALJ gave little weight to Dr. Tait's opinion, because "[D.S.] can focus on homework and video games," and because he "receives good grades in mainstream classes." *Id.* Furthermore, reading the ALJ's decision in its entirety shows that the ALJ gave greater weight to "the entirety of the evidence," specifically the more recent evidence of D.S.'s "improvement in functioning and school performance." R. 11-1 at 30 (AR 26); *see also id.* at 28 (AR 24) ("[D.S.'s] current levels of scholastic aptitudes had matured to overall levels typical for his age, and his symptoms were not as pronounced as in the past."); *id.* at 30 (AR 26) ("the evidence [in the medical and school records] . . . shows improvement in functioning and good performance at school"). The ALJ also noted that D.S.'s functioning in daily life activities has improved in that Stevenson and Dr. Finn testified that he "is learning to make better judgments," and has demonstrated an "improvement in judgment" since his citation for trespassing. *Id.* at 29 (AR 25). Thus, although the ALJ's analysis did not mention Dr. Tait's opinion by name, and the ALJ did not couch her analysis in terms of "weight," the ALJ weighed Dr. Tait's opinion against the "entirety of the

evidence," with greater weight given to more recent evidence, in coming to her decision to deny SSI to D.S.

Additionally, the regulatory requirement Stevenson cites which provides that an ALJ must "evaluate every medical opinion," 20 C.F.R. § 404.1527(c), is qualified by a number of caveats applicable to Dr. Tait. For instance, under this regulation an ALJ should not give a treating physician's opinion "controlling weight" if it is "inconsistent with the other substantial evidence in [the] case record." *Id.* § (c)(2). And if a treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ is required to consider other factors to determine the appropriate weight to assign the opinion in question, including: (1) the "length of the treatment relationship and the frequency of examination," *id.* § (c)(2)(i); (2) the extent to which the opinion is "supported" by, *id.* § (c)(3), and "consistent" with other evidence, *id.* § (c)(4); and (3) "the extent to which an acceptable medical source is familiar with the other information in [the] case record," *id.* § (c)(6).

A number of these factors are relevant to Dr. Tait's opinion and justify the ALJ's decision to afford little weight to Dr. Tait's opinion. As discussed, the ALJ's written decision makes clear that she weighed the age of Dr. Tait's opinion against the more current evidence of D.S.'s achievement at school and success in daily activities. This was a reasonable decision given that Dr. Tait last examined D.S. sometime before December 1, 2010, when he and his family moved from North Dakota to Chicago, when he was still 12 years old. At the time of the hearing before the ALJ on December 17, 2012, D.S. was 15 years old and had started high school.

By that date, Dr. Tait no longer had a "treatment relationship" with D.S., *see* 20 C.F.R. § 404.1527(c)(2)(i), and she was no longer "familiar with the other information in [the] case record," *id.* § (c)(6), which was more recent. Her opinion necessarily did not take into account the evidence of D.S.'s progress over the more than two years that had passed since she had last seen D.S. Given this span of time, and the often quickly changing characteristics of adolescent children, it was within the ALJ's discretion to weigh Dr. Tait's opinion in light of D.S.'s current progress and his more recent medical and school records, which demonstrate that D.S. is functioning well both in school and in his life generally. The ALJ's written decision makes this line of reasoning clear and allows the Court to be assured that she considered the material evidence. Thus, the ALJ's failure to expressly state what specific weight she gave Dr. Tait's opinion is harmless. *See Schreiber v. Colvin*, 519 Fed. App'x 951, 959 (7th Cir. 2013) ("'[W]hile the ALJ did not explicitly weigh each factor in discussing [the doctor's] opinion, his decision makes clear that he was aware of and considered many of the factors, including [the doctor's] treatment relationship with [the plaintiff], the consistency of her opinion with the record as a whole, and the supportability of her opinion.").[2]

---

[2] *See also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) ("[T]here is a strong indication that the ALJ did consider and weigh the evidence provided in [the doctor's] report concerning the extent of [the plaintiff's] limitations, even though he did not specifically mention the statement that [the plaintiff] could sit for only about fifteen minutes. . . . Because we can track the ALJ's reasoning and be assured that the ALJ considered the important evidence, we believe that the ALJ has met the minimal articulation standard.").

## B.    Dr. Sandhu

Stevenson also argues that the ALJ's failure to analyze Dr. Sandhu's October 4, 2011 report was reversible error because the report contradicted the ALJ's finding that D.S. had a "less than marked limitation in interacting and relating with others" and constituted a failure to evaluate every medical opinion. R. 13 at 9. Stevenson further asserts that the ALJ's two-sentence analysis of Dr. Sandhu's medical opinion was "flawed because the ALJ did not evaluate [it] with regard to the factors specified in 20 C.F.R. § 404.1527(d)." R. 13 at 9-10.

The ALJ's failure to specifically mention the October 2011 report was, quite simply, not a significant omission. An ALJ need not specifically weigh every factor leading her to reject a medical opinion, but need only provide a "logical bridge" between the evidence and her conclusions. *See Schreiber*, 519 Fed. App'x at 957. The ALJ specifically considered Dr. Sandhu's January 5, 2012 letter, which consisted of a mere four sentences and no explanation of what observations led to Dr. Sandhu's diagnosis. R. 11-1 at 449 (AR 445). The October 2011 report Stevenson claims contradicts the ALJ's decision was similarly sparse. It consisted of checked boxes indicating that D.S. had marked limitations in activities of daily functioning and ability to maintain interpersonal relationships, but included no further explanations or examples of why Dr. Sandhu believed D.S. was limited in those functions. R. 11-1 at 382-89 (AR 378-85). There was nothing in the October 2011 report that was not expressed in the January 2012 letter. Thus, by addressing the January 2012 letter, the ALJ also addressed the October 2011 report.

Similarly, Stevenson's argument that the ALJ failed to comply with 20 C.F.R. § 404.1527(d) in evaluating Dr. Sandhu's opinion fails. Both of Dr. Sandhu's opinions are completely devoid of examples as to how or why Dr. Sandhu found D.S. had marked limitations. The more verbose of the two states in its entirety that:

> D.S. has been diagnosed with Pervasive Developmental Disorder. He is totally disabled. He is a special needs child[.] He has severe impairments in his social and academic functioning. Please assist him with his disability claim.

R. 11-1 at 449 (AR 445). This entirely conclusory statement lacks any credibility in light of the testimony given by D.S. and Stevenson concerning his daily activities, and the documentary evidence regarding his achievement in school. Additionally, the "[o]pinion that [a claimant is] disabled" is "reserved to the Commissioner," 20 C.F.R. § 404.1527(d)(1), and should be "give[n] [no] special significance," *id.* § (d)(3). The ALJ's decision to "afford this opinion no weight" was justified, both because it is procedurally improper, and because, as the ALJ noted, it "is not supported by the evidence." R. 11-1 at 30 (AR 26).

## C.    Dr. Finn

The ALJ summarized Dr. Finn's testimony and her written medical opinion and concluded that Dr. Finn "seemed to advocate that the child was disabled or had significant limitations." R. 11-1 at 30 (AR 26); *id.* at 27-30 (AR 23-26). After summarizing Dr. Finn's opinion the ALJ concluded, "as explained, the medical and school records do not support [Dr. Finn's opinion]." R. 11-1 at 30 (AR 26). Stevenson contends that the ALJ's two sentence analysis of Dr. Finn's opinion evidence was

insufficient because it was "unclear what weight the ALJ actually gave to Dr. Finn's opinions." R. 13 at 10.

As with Dr. Tait and Dr. Sandu, the ALJ's consideration of Dr. Finn's medical opinion provided the requisite logical bridge from the evidence to the ALJ's rejection of Dr. Finn's opinion. The ALJ stated that "the medical and school records do not support" Dr. Finn's opinion. *See* R. 11-1 at 30 (AR 26). This statement constitutes a weighing of Dr. Finn's opinion even though it does not frame the analysis in terms of "weight."

Furthermore, this statement is not the ALJ's only reasoning applicable to Dr. Finn's opinion. It is clear from the entirety of the ALJ's written decision that she weighed the more recent evidence of D.S.'s performance in school and daily functioning against the medical opinion evidence, including Dr. Finn's opinion and testimony, and determined that the opinion evidence was not as persuasive. *See Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("the statute does not require full explanation"); *see also Schreiber*, 519 Fed. App'x at 959 ("[The ALJ's] decision makes clear that he was aware of and considered many of the factors."); *Diaz*, 55 F.3d at 308 ("Because we can track the ALJ's reasoning and be assured that the ALJ considered the important evidence, we believe that the ALJ has met the minimal articulation standard."). Since the ALJ's decision clearly expresses the reasoning for her decision, the ALJ's failure to specifically address Dr. Finn's opinion in greater detail is not a basis for remand.

## II.     Failure to Adequately Develop the Record

### A.     Dr. Finn's Testimony

Stevenson argues that the ALJ failed to thoroughly question Dr. Finn at the hearing. Stevenson contends that "[h]ad the ALJ probed more deeply in her questioning of Dr. Finn, the ALJ may have found that some perceived inconsistencies were reconciled and that likely would have changed the ALJ's assessment of Dr. Finn's opinion evidence in [D.S.'s] favor." R. 13 at 11. Stevenson also argues that the ALJ's questioning of Dr. Finn was too brief and did not ask for enough detailed information. *Id.*

The "claimant bears the burden of proving disability," but "the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The ALJ's "duty is enhanced when a claimant appears without counsel." *Id.* When a claimant appears pro se the ALJ must "scrupulously and conscientiously . . . probe into, inquire of, and explore all the relevant facts." *Id.* Nevertheless, the court "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation." *Id.* Finding that the ALJ failed to assist a pro se claimant in sufficiently developing the record requires a "significant omission" and "an omission is significant only if it is prejudicial." *Id.* "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* Rather, in order to demonstrate prejudice, the

claimant must "set forth specific, relevant facts . . . that the ALJ failed to consider." *Id.*

The ALJ's examination of Dr. Finn was adequate. The ALJ asked Dr. Finn about the most salient aspects of D.S.'s characteristics and symptoms, including his ability to focus, his ability to socialize, and his issues with anger. The ALJ also asked Dr. Finn about the accommodations she recommended that D.S.'s school implement to address his symptoms.

The ALJ's questions were direct and sought specific examples of D.S.'s behavior. In general, Dr. Finn's responses to the ALJ's questions were vague and cursory. Moreover, when Dr. Finn offered more detailed anecdotes about D.S.'s abilities, they generally contradicted her opinions. For instance, the ALJ's questioning at three separate points during Dr. Finn's testimony addressed D.S.'s ability to focus. Dr. Finn initially testified that D.S. "definitely" had trouble focusing, implying that this difficulty was severe. Dr. Finn, however, never explained how this difficulty manifested itself. When the ALJ followed up with a more specific question referencing Stevenson's testimony that D.S. had trouble following "multistep" directions, Dr. Finn responded with a nearly incoherent description of her therapy sessions with D.S. including an unexplained reference to "chew[ing] gum." When the ALJ inquired as to the accommodations Dr. Finn recommended for D.S. at school, Dr. Finn noted that D.S. is "not hyper," but is "more of a drifter" who simply needs his teachers to be aware of his tendency to lose focus and "kind of queue . . . to bring him back." R. 11-1 at 73 (AR 69). This

description of the assistance D.S. needs to succeed does not comport with Dr. Finn's testimony that he has severe trouble focusing.

Other aspects of Dr. Finn's testimony are similarly unhelpful or contradictory. When the ALJ asked Dr. Finn for "specific examples" demonstrating that D.S. is socially naïve, Dr. Finn could only point to the one incident in which D.S. received a "ticket" from the police. Not only was this the only incident Dr. Finn cited, but she noted that D.S. has learned from this incident and is now more careful interacting with his peers. The ALJ also asked Dr. Finn about Stevenson's testimony that D.S. has anger issues. Dr. Finn agreed that this was an issue for D.S. Yet, she testified that D.S. is always polite with her, and she indicated that D.S.'s anger was no longer an issue because he is no longer living with his uncle who had antagonized him. When the ALJ asked Dr. Finn to describe D.S.'s "problems" "in general," Dr. Finn concluded by stating that D.S. has "done well."

On the whole, the ALJ's questioning of Dr. Finn was sufficient to explore Dr. Finn's opinion that D.S. "needs significant support both socially and emotionally at school, as well as the community." Dr. Finn frequently had difficulty responding to the ALJ's questions in detail, and any detail she did provide was consistently contrary to her written opinion. Based on the testimony the ALJ elicited from Dr. Finn, there is no basis to find that the ALJ should have sought additional testimony from her.

Moreover, even if the ALJ's examination of Dr. Finn was lacking (which it was not), Stevenson has not demonstrated any prejudice on this basis. Stevenson

cannot prevail on this argument without offering at least a suggestion of what specific further evidence the ALJ would have elicited through further questioning. See *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) ("[the claimant] offers not hint of what further evidence the ALJ would have elicited and thus has not shown prejudice"). Stevenson's contention that had the ALJ continued to question Dr. Finn it "likely would have changed the ALJ's assessment of Dr. Finn's opinion evidence," R. 13 at 11, is insufficient to show prejudice. As discussed, the ALJ's questioning addressed all the salient issues in D.S.'s case, but Dr. Finn consistently provided unhelpful information, or information that failed to comport with her stated opinion. There is no indication in the hearing transcript that further questioning of Dr. Finn would have elicited testimony that would have altered the ALJ's decision.

### B. Supplementary Documentary Evidence

Stevenson also argues that the ALJ failed to properly supplement the record by not accepting documents she brought to the hearing. R. 13 at 11. Stevenson brought the following documents with her to the hearing: (1) records from Germany; (2) court documents regarding a trespassing charge; (3) school records prior to the date of D.S.'s application; and (4) D.S.'s most recent IEP. *See* R. 11-1 at 45-47 (AR 41-43). The ALJ supplemented the record with the records from Germany, the court documents, and the most recent IEP. *Id.* The ALJ declined the older school records because they were not relevant to this application. There is no basis for Stevenson's argument that the ALJ failed to properly supplement the documentary record.

## C.    Additional Witness

Stevenson also contends that the ALJ erred in deciding not to take testimony from D.S.'s grandmother. R. 13 at 11. The ALJ asked Stevenson whether there was "anything in particular" D.S.'s grandmother was going to add to the testimony already heard. R. 11-1 at 68 (AR 64). Stevenson said, "I really don't know," but indicated that D.S.'s grandmother could bolster Stevenson's own testimony. *Id.* ("I mean, I think she can, she can – she's more so of being not biased maybe, is what I'm trying to reach, or trying to say. But I think she, she's been around him long enough to, to know, you know – how he is, and stuff like that."). The ALJ expressed that D.S.'s grandmother's testimony would likely duplicate Stevenson's own testimony, and Stevenson responded, "Okay. . . . All right." R. 11-1 at 68-69 (AR 64-65). *Id.*

Stevenson has not demonstrated that the ALJ's decision not to take testimony from D.S.'s grandmother prejudiced Stevenson's application in any way. Stevenson has not set forth facts that D.S.'s grandmother would have testified to that the ALJ failed to consider when Stevenson herself testified. Absent such a showing, the ALJ did not abuse her discretion in determining the additional testimony was unnecessary.

## III.    The ALJ's Credibility Determination

After reviewing the testimony and documentary evidence, the ALJ made the following statement regarding her assessment of the evidence and credibility of the "allegations":

> I acknowledge that I have not accommodated all of the alleged symptoms and limitations. This is because, after considering the factors in SSR 96-7p, I find the allegations are not fully credible. The evidence fails to establish disabling limitations. The claimant is functioning pretty well, receives good grades in mainstream classes, testified he can concentrate on his homework, received average IQ scores and was noted to be polite by his school. The claimant was polite and answered questions in a normal manner at the hearing. Overall, he is doing well, despite his impairments.

R. 11-1 at 29 (AR 25). Stevenson argues that this reasoning is flawed for two reasons: (1) "it is impossible to know what factors [from SSR 96-7p] [the ALJ] considered and what conclusions she drew as a result from this brief conclusory statement," R. 13 at 12; and (2) "[t]he ALJ attempts to support her credibility determination with evidence from the record by stating in part that [D.S.] 'testified he can concentrate on his homework,' . . . . [which] is a misstatement of [D.S.'s] testimony." *Id.* at 12 (quoting R. 11-1 at 29 (AR 25)).

ALJs' "credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, [courts must] give it a commonsensical reading." *Id.* "Accordingly, [courts should] reverse credibility determinations only if they are patently wrong." *Id.*

Additionally, to comply with SSR 96-7p regarding credibility determinations an ALJ must "'consider the entire record' and . . . [provide] 'specific reasons for the finding on credibility, supported by the evidence in the case record.'" *Schreiber*, 519

Fed. App'x at 960 (quoting SSR 96-7p, 1996 WL 374186 at *4). "In other words, the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, . . . types of treatment received and medication taken, and functional limitations." *Simila*, 573 F.3d at 517 (citing SSR 96-7p).

Stevenson does not cite any authority for her argument that the ALJ must cite specific "factors in SSR 96-7p" in order to properly apply that ruling. Rather, SSR 96-7p and the case law applying that regulation require ALJs to "consider the entire record" and provide "specific reasons for [a] finding on credibility." *See Schreiber*, 519 Fed. App'x at 960. In this case, the ALJ determined that the allegations that D.S. has a debilitating inability to concentrate and is prone to debilitating anger were not supported by the relevant documentary evidence and testimony showing that "[t]he claimant is functioning pretty well, receives good grades in mainstream classes, testified he can concentrate on his homework, received average IQ scores and was noted to be polite by his school." As discussed with respect to Stevenson's argument that the ALJ failed to properly consider the opinions of D.S.'s treating physicians, the ALJ weighed those opinions against the more recent documentary evidence of D.S.'s success in his daily activities generally, and at school in particular. This reasoning is sufficient to justify the ALJ's finding that D.S. and Stevenson's allegations of debilitating anger and inability to focus were "not fully credible."

Stevenson also argues that the ALJ misconstrued D.S.'s testimony about his ability to concentrate on his homework, and that this error undermines the ALJ's credibility determination of D.S. and Stevenson. At the hearing the ALJ asked D.S. if he had "any problems focusing or concentrating on [his] homework," and D.S. responded, "Sometimes, because it sometimes can be too hard." R. 11-1 at 54 (AR 50). The ALJ also asked if D.S. "ever [had] a hard time concentrating or focusing" at school, and D.S. responded, "Yes." *Id.* at 55 (AR 51). The ALJ initially recounted this testimony in her written decision by stating that D.S. "sometimes . . . has problems focusing on his homework because it is too hard," and he "alleged trouble concentrating and focusing while at school." *Id.* at 27 (AR 23). Later in the opinion, the ALJ stated that D.S. "can focus to do his homework," *id.*, and "can concentrate on his homework." *Id.* at 29 (AR 25).

The ALJ's differing characterizations of D.S.'s testimony do not contradict each other. D.S. testified that he "sometimes" has trouble concentrating, which the ALJ noted. Obviously, that also means that D.S. can focus on his homework at other times.

Further, the ALJ did not rely on this statement as the sole factor for her credibility determination. She also relied on the medical and school evidence to support her conclusions that D.S. was functioning "pretty well," receiving good grades in mainstream classes, was polite, and had an average IQ score. D.S. testified that he did his homework himself much of the time and that he could not concentrate *sometimes*, not all of the time. In light of this evidence, the ALJ did not

mischaracterize the record when she found that D.S. can concentrate on his homework.

It is well established that an ALJ's opinion need not be "perfect." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Even when an opinion includes some boilerplate language (such as a blanket statement that she considered the SSR 96-7p factors) determinations of credibility can still be adequate. *Id.* The ALJ used her discretion to make a credibility determination based on the evidence and then listed the evidence she relied upon. The ALJ's credibility determination in this case was supported by specific reasons based upon the evidence, and was not "patently wrong." *Jones*, 623 F.3d at 1160. Thus, the court will not disturb it.

## Conclusion

For the foregoing reasons, Defendant's motion for summary judgment, R. 20, is granted, and Plaintiff's motion for summary judgment, R. 12, is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  May 19, 2015